# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

**KELLY J. RICHARDSON, and JAMES POWELL, personally and as next friend for I.R. a minor, and S.P., a minor,**

           Plaintiffs,

    v.

**EMILIE SCHUBERT, in her individual capacity, GINGER VAN WINKLE, in her individual capacity, ERIN WIRTZ, in her individual capacity, JENNIE SMITH, in her individual capacity, KRISTIN LEMON, in her individual capacity, CARLOS CRUTCH, in his individual capacity, LINDSEY VERNOOY, in her individual capacity, DANIELLE SANTILI-DAY, in her individual capacity,**

           Defendant.

Case No. 3:14-cv-01027-ST

**FINDINGS AND RECOMMENDATION**

**STEWART, Magistrate Judge:**

## INTRODUCTION

Plaintiffs filed this action against six employees of the Oregon State Department of Human Services ("DHS"), defendants Erin Wirtz ("Wirtz"), Jennie Smith ("Smith"), Kristin Lemon, Carlos Crutch, Lindsey Vernooy, and Danielle Santili-Day (collectively "Oregon defendants"), after they initiated protective custody proceedings against I.R., their adoptive

daughter, and placed her in foster care for about nine months.[1]  The remaining defendants are two case workers for the Arizona Department of Child Safety ("ADCS"), Emilie Schubert (nka Emilie Christman) ("Schubert") and Ginger Van Winkle ("Van Winkle") (collectively "Arizona defendants"), who seized I.R. while she was visiting her biological mother in Arizona and returned her to DHS.

The First Amended Complaint alleges claims:  (1) against all defendants under 42 USC § 1983 for depriving plaintiffs of their right to a familial relationship under the Fourteenth Amendment;[2] (2) against the Oregon defendants for intrusion into seclusion and intentional infliction of emotional distress; and (3) against the Arizona defendants under 42 USC § 1983 for depriving plaintiffs of their right to be free from unreasonable seizure under the Fourth Amendment and procedural due process under the Fourteenth Amendment.  This court has subject matter jurisdiction over the § 1983 claims under 28 USC § 1331 and supplemental jurisdiction over the state law claims under 28 USC § 1367.

The Oregon defendants have filed an Amended Motion for Summary Judgment (docket #58) against all claims alleged against them.  For the reasons set forth below, the Oregon defendants' motion should be denied as to Wirtz and Smith for their prosecutorial conduct which resulted in issuance of the initial protective order on June 26, 2012, and otherwise should be granted.

///

///

---

[1] Plaintiffs have agreed to dismiss defendant Carlos Crutch after learning through discovery that he did not participate in the decisions to place I.R. in foster care.

[2] The prayer for relief also refers to a Fourth Amendment violation by Wirtz and Smith "for submitting false information to the court causing the unreasonable seizure and imprisonment of I.R." First Amended Complaint, Prayer, ¶ 4.  However, plaintiffs only allege and argue a claim for violation of the Fourteenth Amendment.

## STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FRCP 56(a). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). On a motion for summary judgment, the court "draws all justifiable inferences in favor of the non-moving party." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F3d 1119, 1125 (9th Cir 2014), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

## UNDISPUTED FACTS

In July 2007 at the age of three, I.R. was removed from her biological mother, Kerri Smith (nka Kerri Phelps) ("Phelps"), due to drug use and neglect. Richardson Decl. (docket #70), ¶ 1; Attachment DD. [3] Plaintiffs then became I.R.'s foster parents. Richardson Decl., ¶ 1. On July 8, 2008, Phelps entered into a Stipulated Judgment terminating her parental rights to I.R, and plaintiffs adopted I.R. on February 19, 2009. *Id*; Attachments A & Q.

During the course of I.R.'s removal, she developed several psychological and serious behavioral issues. Richardson Decl., ¶¶ 2-3; Attachment EE. Despite more than four years of psychological counseling, therapies, and care-taking, I.R. failed to respond to treatment. *Id*, ¶¶ 5-6. Because I.R.'s issues seemed to center around the feeling of abandonment by Phelps, Kelly J. Richardson ("Richardson") considered the possible benefit of I.R., then seven years old,

---

[3] Plaintiffs attach exhibits to the Declaration of Mikel Miller (docket #69) marked as Attachments AA-MM. In addition, the Oregon defendants have attached exhibits to their motion marked as Attachments A-S. Although none of the Oregon defendants' exhibits are properly authenticated, plaintiffs have not objected to any of them.

of having some direct contact with Phelps. *Id*, ¶ 6. She located Phelps in Tucson, Arizona, through Facebook, spent seven months investigating and talking to her, and consulted with I.R.'s counselors. *Id*. She selected the beginning of summer vacation in June 2012 for a visit to reconnect with Phelps which would allow I.R. to return home any time or stay until the end of summer vacation. *Id*, ¶ 7.

Richardson flew with I.R. to Tucson, Arizona, in June 2012 and stayed for three days to assure that Phelps was capable of providing a safe and stable environment and that I.R. was comfortable. *Id*, ¶ 8. She then returned to Oregon alone, but maintained daily contact with I.R. and/or Phelps and remained available to retrieve I.R. at any time. *Id*.

Shortly after Richardson returned to Oregon, I.R. reacted by demonstrating some of her bad behaviors, and Phelps spanked her. *Id*, ¶ 9; Attachment C, p. 3; Attachment O, p. 7. After Phelps told Richardson about the incident, they agreed to allow the visit to continue. Richardson Decl., ¶ 9. Richardson told I.R.'s mental health counselor, Alison Williams ("Williams"), that I.R.'s visit with Phelps had not yet ended and mentioned the spanking incident. *Id*, ¶ 10; Attachment FF, pp. 47-48.

Williams then called ADCS and reported what Richardson had told her and how I.R. had arrived in Arizona. Williams Depo., p. 52. A Child Safety Worker with the ADCS, Sarah Rothpletz ("Rothpletz"), conducted initial interviews and an inspection of Phelps's home on June 21, 2012, and observed that I.R. was not unsafe due to any present danger, adding: "There are no current concerns about sexual abuse. There are previous allegations from Oregon. The child denied any current abuse or neglect. The adoptive mother and [redacted] are working on getting the child services." Attachment AA; Attachment BB ("Van Winkle Decl."), ¶ 3; Attachment JJ ("Christman Decl."), ¶ 3. The Arizona defendants (Van Winkle and Schubert) then interviewed

the Oregon DHS caseworker who had been involved in the 2007 removal of I.R. from Phelps. Van Winkle Decl., ¶ 3; Christman Decl., ¶ 3.  The Oregon DHS caseworker's professional judgment was that I.R. should be removed from Phelps's home, and she told the Arizona defendants that DHS was coming to Arizona with a court order to take physical custody of I.R. and asked if ADCS would help facilitate the removal.[4]  *Id.*  Based on information obtained from Williams, Phelps, Richardson, I.R., the Oregon DHS caseworker, and observations of Phelps's home, the Arizona defendants decided to remove I.R. from Phelps's home and hold her until Oregon DHS could come for her.  Van Winkle Decl., ¶¶ 2-3; Christman Decl., ¶¶ 2-3.  On June 25, 2012, they served Phelps with a Notice of Removal of I.R. from Phelps's home and placed her in foster care.  Van Winkle Decl., ¶ 4; Christman Decl., ¶ 4; Attachment C, p. 3; Attachment N.

On June 26, 2012, Wirtz informed plaintiffs that DHS would seek temporary custody of I.R. at a court hearing that day.  Attachment O, p. 8.  Wirtz signed an affidavit in support of her request for protective custody for I.R.  Attachment C.  Smith, in her role as Wirtz's supervisor, assumes that she approved it.  Attachment HH, pp. 15-16.  Clackamas County Deputy District Attorney Colleen Gilmartin filed a dependency petition, requesting transfer of legal custody of I.R. to DHS.  Attachment D.  At the hearing, Judge Katherine E. Weber granted DHS temporary custody of I.R. for transfer to a residential facility, adding:

> I want for when [I.R.] gets off the plane, she's going to go one of two places.  She's either going to go to the facility that she can stay in and can be the best facility for her, or I want her to go home and wait with mom and dad until a facility has an open bed for her.  I don't want her to go to a foster placement.  I don't want her to go to a temporary bed.  I want her go to the right place.  And if the agency is going to need a few days to figure

---

[4] As discussed below, it is reasonable to infer that the Oregon caseworker who spoke to the Arizona defendants was Wirtz.  Although Wirtz denies that she requested ADCS to remove I.R. from Phelps's home, this court must view the facts in favor of plaintiffs.

out what the right place is, I want her to go back to mom and dad while
we're waiting for that place to be available.

Attachment T, pp. 19-20.

That same day, the court signed a form Order which granted temporary custody of I.R. to
DHS and approved shelter care.  Attachment B, p. 1.  The form Order also includes checked-off
findings that: (1) I.R. could not go home without danger of physical and emotional injury; (2) no
services were being provided because they would not have eliminated or prevented the need for
removal of I.R. from plaintiffs; and (3) it was in I.R.'s best interest to be placed outside of the
home.  *Id*, p. 2.

On June 27, 2012, DHS arrived in Arizona with the Oregon removal order, and ADCS
transferred custody of I.R. to DHS.  Attachment O, pp. 9-10; Van Winkle Decl, ¶ 4; Christman
Decl., ¶ 4.  There were no immediate residential or therapeutic openings for I.R.  Attachment O,
p. 10.  DHS learned that I.R. might not qualify for a higher level placement, and the providers
were concerned about plaintiffs' investment and participation with mental health "wrap-around"
services.  *Id.*  DHS placed I.R. in a foster home with wrap-around services, even though Judge
Weber had said she did not want I.R. placed in foster care.  *Id*; Attachment T, p. 20.  Wirtz called
plaintiffs that same day (June 27, 2012) to inform them of the foster care placement.  Attachment
O, p. 10.  At a court hearing on July 12, 2012, another judge decided to leave I.R. in foster care.
Attachment KK.

On October 23, 2012, based on a resolution reached by the parties, the court entered a
Judgment naming DHS as I.R.'s legal guardian for an "indefinite period."  Attachment R, p. 3.
The court also ordered DHS to pursue the "case plan" of returning I.R. home and to use "all due
efforts to return the child to" plaintiffs.  *Id*; Attachment LL, p. 6.  On March 15, 2013, the court

returned I.R. to plaintiffs, but continued DHS's legal custody. Attachment S. On May 28, 2013, the court terminated DHS's custody over I.R. Attachment L.

## FINDINGS

### I.    § 1983 Claims

Plaintiffs allege three counts against some or all of the Oregon defendants for violating their Fourteenth Amendment substantive due process right to a familial relationship without undue government interference.[5] First, plaintiffs allege that Wirtz "submitted false information, and omitted relevant information, in an affidavit to the court for the purpose of inducing the court to issue an order authorizing the seizure of I.R." and that Smith, Wirtz's supervisor, "approved submitting the affidavit with false information." First Amended Complaint, ¶¶ 50-52 (Count 1). Second, plaintiffs allege that Wirtz unreasonably kept I.R. from her home "when there was no reasonable basis for believing that I.R.'s welfare was endangered." *Id*, ¶¶ 53-55 (Count 2). Third, plaintiffs allege that all the Oregon defendants "continued to exercise the authority given them by the court seizure order to retain custody of I.R. and would not let her return home even though [they] knew, or should have known, there was no risk of danger to I.R." *Id*, ¶¶ 56–58. The Oregon defendants seek summary judgment against each of these claims based on absolute or qualified immunity and the lack of supporting facts.

In their response to the motion, plaintiffs characterize their claims somewhat differently than alleged in the First Amended Complaint. They refer to the initial seizure of I.R. on June 25, 2012, in Arizona at Wirtz's request; issuance of the initial protective order by the Oregon court on June 26, 2012, based on Wirtz's false affidavit; and the continued seizure of I.R. in foster care

---

[5] The Oregon defendants construe plaintiffs' § 1983 claim to include allegations of procedural due process violations. However, plaintiffs do not defend a procedural due process claim in their response, and the First Amended Complaint alleges procedural due process violations only by the Arizona defendants. First Amended Complaint, ¶ 22. For these reasons, the court construes the allegations against the Oregon defendants as based only on substantive due process violations.

through March 15, 2013.  Issuance of the initial protective order on June 26, 2012, corresponds to the claim that Wirtz submitted a false affidavit to the court.  *Id*, ¶¶ 50-52 (Count 1).  The continued seizure of I.R. in foster care through March 15, 2013, corresponds to the last claim. *Id*, ¶¶ 56–58.  However, the initial seizure of I.R. does not correspond to the remaining claim that Wirtz unreasonably kept I.R. from her home.  *Id*, ¶¶ 53-55 (Count 2).

With respect to the initial seizure of I.R. in Arizona, plaintiffs complain that it lacked judicial authorization or any evidence that I.R. was in imminent danger of serious bodily injury. However, I.R. was initially seized by the Arizona defendants, not by Wirtz.  Although the Arizona defendants made the decision to seize I.R. based in part on the request of the Oregon caseworker (who presumably was Wirtz), plaintiffs do not allege that Wirtz gave any false information to the Arizona defendants in order to induce them to seize I.R.  Thus, this court cannot conceive of any basis to hold Wirtz liable for the initial seizure of I.R. in Arizona.

However, as discussed below, Wirtz may be held liable for omitting to tell the Oregon court that she had requested the Arizona defendants to seize I.R. which led to the court's decision to issue the initial protective order on June 26, 2012, and to authorize DHS to seize I.R. from ADCS.  In other words, Wirtz's potential liability arises from her prosecutorial conduct, including her alleged contact with ADCS, which ultimately resulted in DHS's seizure of I.R.  In order to analyze the immunity defenses raised by the Oregon defendants to the § 1983 claims, this court construes the initial seizure of I.R. on June 25, 2012, as part of the allegedly wrongful prosecutorial conduct by Wirtz and Smith that led to the issuance of the protective order on June 26, 2012.

///

///

A.    **Governmental Immunity**

The Oregon defendants argue that their decisions to initiate protective proceedings, place I.R. in temporary custody, and eventually place her in foster care are protected under either absolute or qualified immunity.  Immunity under § 1983 is a matter of federal law.  *Martinez v. California*, 444 US 277, 284 n8 (1980).

Absolute immunity protects officials whose special functions or constitutional status requires complete protection from suit, such as legislators in their legislative functions, judges in their judicial functions, and prosecutors and similar officials in prosecutorial functions.  *Harlow v. Fitzgerald*, 457 US 800, 807 (1982).  Qualified immunity generally protects discretionary acts by officials.  *Id* at 818.  The test for evaluating a qualified immunity claim is as follows:

> The first step . . .  is to determine whether the plaintiff has shown that the action complained of constituted a violation of his or her constitutional rights.  If the court is satisfied that a constitutional violation occurred at the hands of a government official, the second step is to determine:  (1) whether the violated right was clearly established, and (2) whether a reasonable public official could have believed that the particular conduct at issue was lawful.

*Butler* v. *Elle*, 281 F3d 1014, 1021 (9th Cir 2002), citing *Harlow*, 457 US at 818.

For both absolute and qualified immunity, the function of the position determines the immunity, not the status or title.  *Briscoe v. LaHue*, 460 US 325, 342 (1983).

1.    **Issuance of Protective Order**

a.    **Absolute Quasi-Prosecutorial Immunity**

The Oregon defendants first argue that Wirtz and Smith[6] are entitled to absolute immunity for their quasi-prosecutorial actions of seeking and obtaining a court order to take I.R. into protective custody on June 26, 2012.

---

[6] The Oregon defendants also argue that plaintiffs have not shown adequate personal participation by Smith to support individual liability under § 1983.  Individual liability under § 1983 "arises only upon a showing of personal

The Ninth Circuit has "granted state actors absolute immunity only for those functions that were critical to the judicial process itself," such as "'initiating a prosecution.'" *Beltran v. Santa Clara Cnty.*, 514 F3d 906, 908 (9th Cir 2008), quoting *Miller v. Gammie*, 335 F3d 889, 896 (9th Cir 2003) (*en banc*). When initiating and pursuing child dependency proceedings, state social workers are performing quasi-prosecutorial functions:

> Although child services workers do not initiate criminal proceedings, their responsibility for bringing dependency proceedings, and their responsibility to exercise independent judgment in determining when to bring such proceedings, is not very different from the responsibility of a criminal prosecutor. The social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children. The social worker's independence, like that of a prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit.

*Meyers v. Contra Costa Cnty. Dep't of Soc. Servs.*, 812 F2d 1154, 1157 (9th Cir 1987).

For these reasons, social workers enjoy quasi-prosecutorial immunity when they make "discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from the parents." *Beltran*, 514 F3d at 908, quoting *Miller v. Gammie*, 335 F3d 889, 898 (9th Cir 2003). As a result, Wirtz and Smith have absolute immunity against plaintiffs' alleged constitutional deprivation based on DHS's pursuit of protective custody of I.R.

However, plaintiffs argue that Wirtz and Smith lost that absolute immunity by submitting false statements and omitting relevant information in Wirtz's affidavit to the court in support of the request for a protective custody order. Social workers are not entitled to:

---

participation by the defendant." *Taylor v. List*, 880 F2d 1040, 1045 (9th Cir 1989). A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. *Id.* However, Smith admits that she assumed that she reviewed and approved Wirtz's affidavit because that is "[her] role." Attachment HH, pp. 14-15.

> absolute immunity from claims that they fabricated evidence during an
> investigation or made false statements in a dependency petition affidavit
> that they signed under penalty of perjury, because such actions aren't
> similar to discretionary decisions about whether to prosecute. A
> prosecutor doesn't have absolute immunity if he fabricates evidence
> during a preliminary investigation, before he could properly claim to be
> acting as an advocate, . . . or makes false statements in a sworn affidavit in
> support of an application for an arrest warrant.

*Beltran*, 514 F3d at 908 (citations omitted); *see also Costanich v. Dep't of Soc. & Health Servs.*,

627 F3d 1101, 1109 (9th Cir 2010).

In her affidavit, Wirtz stated that "[ADCS] served [Phelps] a 'Notice of Removal' and

placed [I.R.] in foster care. Arizona requested Oregon DHS make arrangements to have [I.R.]

returned to Oregon as they had no jurisdiction over [I.R.] since her legal guardians were in

Oregon." Attachment C, p. 2. Plaintiffs argue that this statement is false because Wirtz omitted

the fact that she had instructed ADCS to remove I.R. from Phelps's home. As a result, she left

the court with the false impression that ADCS made this decision independently.[7] To support

the falsity of Wirtz's affidavit, plaintiffs have submitted declarations by the Arizona defendants

that they made the decision to remove I.R. from Phelps's home based in part on DHS's request:

> [We] interviewed the caseworker from ODHS. The caseworker had been
> involved in the removal of IR from the birth-mother's home and had
> additional information. The Oregon caseworker's professional judgment
> was that IR should be removed from the birth-mother's home. She said
> that ODHS was coming with a court order to take physical custody of IR,
> and she asked if ADCS would help facilitate the removal. This
> information contributed to our decision to remove IR from the birth-
> mother's home and hold her safely until ODHS could come for her.

Van Winkle Decl. ¶ 3; Schubert Decl., ¶ 3.

---

[7] Plaintiffs also argue that Wirtz made similar misrepresentations at the June 26, 2012, and subsequent hearings.
However, the portion of plaintiffs' claim regarding false statements to the court specifically refers to Wirtz's
affidavit. First Amended Complaint, ¶ 51. Therefore, a separate due process claim based on statements Wirtz made
at court proceedings on June 26, 2012, and thereafter is not properly before the court.

11 – FINDINGS AND RECOMMENDATION

In addition, Wirtz stated in her affidavit that she had learned from Williams's supervisor that Richardson "had been talking about transitioning [I.R.] to Ms. Phelps but [I.R.'s therapeutic team] were discouraging the move." Attachment C, p. 2. However, according to both Richardson and Williams, Williams had not cautioned Richardson against reconnecting I.R. with Phelps. Richardson Decl., ¶ 7; Williams Depo., p. 46. In addition, Wirtz omitted any mention of the home inspection by ADCS concluding that I.R. was not in any danger. Attachment A.

The Oregon defendants assert that the declarations by the Arizona defendants do not constitute sufficient evidence of falsity of Wirtz's affidavit. They do not identify the name of the "Oregon caseworker" whose "professional judgment" was relied upon in making this decision. However, there is no evidence submitted that any DHS caseworker other than Wirtz was involved "in the removal of IR from the birth-mother's home" or discussed I.R. with ADCS. On summary judgment, all factual inferences must be drawn in favor of the nonmoving party. *Olsen v. Idaho State Bd. of Medicine*, 363 F3d 916, 922 (9th Cir 2004). In light of that principle, it is reasonable to infer that Wirtz was the DHS caseworker who communicated with the Arizona defendants.

The Oregon defendants also point out that the Arizona defendants refer to the removal decision as "our decision" and do not specifically state that DHS requested ADCS to remove I.R. on their behalf. According to Wirtz's notes documenting the several telephone calls she had with Van Winkle on June 25, 2012, the Arizona Attorney General's office had advised ADCS to issue a Notice of Removal. Attachment O, pp. 6, 8. Of course, DHS could never instruct the ADCS to execute a Notice of Removal because it has no authority over its equivalent in another state. Presumably, the ADCS was required to gain approval from the Attorney General's office to

comply with Arizona law. However, DHS certainly could request that ADCS facilitate an effort to protect an Oregon child currently living in ADCS's jurisdiction.

Assuming the truth of the Arizona defendants' declarations, Wirtz's affidavit omits all evidence that DHS encouraged and even initiated the effort to remove I.R. from Phelps's home prior to obtaining a protective order. Both Van Winkle and Schubert state that they interviewed the DHS caseworker after Rothpletz had conducted initial interviews and a home inspection on June 21, 2012. Van Winkle Decl., ¶ 2; Schubert Decl., ¶ 2. Based in part on that interview, they made the decision to remove I.R. from Phelps's home and did so on June 25, 2012. Van Winkle Decl., ¶¶ 3-4; Schubert Decl., ¶¶ 3-4. Therefore, they must have interviewed the DHS caseworker sometime before June 25, 2012. Yet Wirtz's notes do not reflect any telephone conversations with ADCS until June 25, 2012, when Van Winkle stated that ADCS "had already staffed with their AG and were advised to serve Phelps with a 'Notice of Removal.'" Attachment O, p. 6. These notes are consistent with Wirtz's affidavit. Nonetheless, they are contradicted by the declarations submitted by the Arizona defendants. This conflict cannot be resolved on summary judgment. Given the record, a reasonable juror could conclude that Wirtz made false statements and/or material omissions to the court in support of DHS's request for protective custody of I.R.

Because plaintiffs have submitted sufficient evidence that Wirtz's affidavit contained false statements, neither she nor Smith are entitled to summary judgment based on quasi-prosecutorial immunity with respect to their actions leading up to the issuance of the protective order on June 26, 2012.

///

///

b.    **Qualified Immunity**

Even if not shielded by absolute immunity, Wirtz and Smith argue that they are entitled

to qualified immunity for their prosecutorial conduct resulting in issuance of the protective order

on June 26, 2012.   They are entitled to qualified immunity unless plaintiffs prove that they

violated a constitutional right that was "clearly established" at the time of the alleged

misconduct.  *Saucier v. Katz*, 533 US 194, 201 (2001).  "To be clearly established, a right must

be sufficiently clear that every reasonable official would have understood that what he is doing

violates that right.  In other words, existing precedent must have placed the statutory or

constitutional question beyond debate."  *Reichle v. Howards*, 132 S Ct 2088, 2093 (2012)

(internal quotation marks, citations, and alterations omitted).

"[T]o establish a substantive due process claim a plaintiff must  . . .  show a government

deprivation of life, liberty or property."  *Nunez v. City of Los* Angeles, 147 F3d 867, 871 (9th Cir

1999).  Plaintiffs have "a Fourteenth Amendment due process right to be free from deliberately

fabricated evidence in a civil child abuse proceeding."  *Costanich*, 627 F3d at 1115.  This is also

referred to as a claim for judicial deception.  *See Chism v. Wash. State*, 661 F3d 380, 386 (9th Cir

2011).  For a judicial deception claim to survive summary judgment, a plaintiff "must make (1) a

'substantial showing' of deliberate falsehood or reckless disregard for the truth, and (2) establish

that but for the dishonesty, the challenged action would not have occurred.  If a plaintiff satisfies

these requirements, 'the matter should go to trial.'"  *Butler*, 281 F3d at 1024 (citation omitted).

"Materiality is for the court, state of mind is for the jury."  *Id* (citation omitted).

As discussed above, plaintiffs have submitted sufficient evidence to create a genuine

issue fact that Wirtz's affidavit included false statements.  However, plaintiffs also must

demonstrate that Wirtz acted deliberately or with reckless disregard for the truth in preparing her

affidavit.  The conflicting accounts of Wirtz and the Arizona defendants of the same

conversation create a genuine factual issue as to whether Wirtz intentionally or recklessly

misrepresented her conversations.  *See Greene v. Camreta*, 588 F3d 1011, 1034 (9th Cir 2009),

*abrogated on other grounds by Camreta v. Greene*, 131 S Ct 2020 (2011) (citations omitted)

(denying qualified immunity based on conflicting accounts of the same conversation to prove the

falsity of an affidavit presented in a protective custody proceeding).  Whether Wirtz did not

misrepresent, or whether she negligently misrepresented, what the Arizona defendants told her is

"a question for the trier of fact, not for this court."  *Id* at 1035 n20.

Nonetheless, the Oregon defendants assert that plaintiffs do not satisfy the second part of

the test for submission of a false affidavit with respect to materiality.  They argue that

information regarding who initiated removal of I.R. from Phelps's home was immaterial to the

court's decision to transfer temporary custody of I.R. to DHS.  The Notice of Removal of I.R.

from Phelps's home was made by the ADCS and the Arizona Attorney General's office.  At the

time of the June 26, 2012 hearing, ADCS had already removed I.R. from Phelp's home.  The

Oregon court to which Wirtz submitted her affidavit was not reviewing ADCS's decision to

remove I.R. from Phelps's home, but was limited to determining whether to grant DHS

temporary custody in order to retrieve I.R. from ADCS.

However, this court concludes that the alleged misrepresentations and omission of

relevant information in Wirtz's affidavit were material to issuance of the protective order.  Had

Wirtz not urged ADCS to remove I.R. from Phelps's home, ADCS likely would not have done

so.  After inspecting Phelps's home, ADCS's own caseworker concluded that it presented no

danger to I.R.  To receive information from Wirtz, who was much more familiar with I.R.,

Phelps and plaintiffs, that conflicted with its own employee's assessment of the situation

"contributed to" and, thus, necessarily was a key factor in, the removal decision by the Arizona defendants.  Van Winkle Decl., ¶ 3; Schubert Decl., ¶ 3.  Had ADCS not taken I.R. into its custody based on input from DHS, but left her with Phelps, then Judge Weber likely would have returned I.R. to plaintiffs' custody.

Moreover, Judge Weber was advised that ADCS had made its own decision to remove I.R. from Phelps's home.  At the hearing, she explained that she would not decide the allegations of abuse made against the parents, but only whether I.R. could go home with plaintiffs after returning to Oregon.  Attachment T, p. 12.  Had Judge Weber known Wirtz's role in initiating the effort to retrieve I.R. and her request to ADCS to remove I.R. from Phelps's home, then she may have been less willing to grant protective custody to DHS.  Thus, plaintiffs have submitted sufficient evidence to support their claim that Wirtz and Smith committed judicial deception.

Finally, to avoid Wirtz's and Smith's qualified immunity defense, plaintiffs must prove that their right to be free from judicial deception was clearly established when Wirtz made the alleged misrepresentations to the court.  The Ninth Circuit has held that the "the right to be free from deception in the presentation of evidence during protective custody proceedings was clearly established [before December 2009]."  *Greene*, 588 F3d at 1035.[8]  Thus, the right was clearly established by June 2012 when Wirtz submitted her affidavit to the court in support of DHS's motion for protective custody.

Accordingly, Wirtz and Smith should be denied summary judgment based on qualified immunity for their prosecutorial conduct resulting in issuance of the protective order on June 26, 2012.

---

[8] As pointed out in *Mann v. County of San Diego*, No. 3:11-CV-0708-GPC-BGS, 2013 WL 4046642, at *13 (SD Cal Aug. 8, 2013), this "holding is at apparent odds with the *Costanich* holding that the similar right to be free from fabrication and/or falsification of evidence in a civil proceeding was not clearly established until 2010." Nevertheless, the right was clearly established by June 2012 when Wirtz submitted her affidavit to the court in support of DHS's motion for protective custody.

2.      **Placement in Foster Care**

a.      **Absolute Quasi-Judicial Immunity**

The Oregon defendants also argue that they are entitled to absolute immunity for their

quasi-judicial actions of carrying out and enforcing the court's orders beginning June 26, 2012,

regarding I.R.'s placement in foster care after her return to Oregon. [9]

Child protective workers enjoy absolute quasi-judicial immunity for executing valid court

orders. *Coverdell v. Dep't of Soc. & Health Servs., State of Wash.*, 834 F2d 758, 765 (9th Cir

1987). "Even actions taken with court approval or under a court's direction are not in and of

themselves entitled to quasi-judicial, absolute immunity." *Miller*, 335 F3d at 897, citing *Antoine

v. Byers & Anderson, Inc.*, 508 US 429, 435-36 (1993). "Instead, to enjoy absolute immunity for

a particular action, the official must be performing a duty functionally comparable to one for

which officials were rendered immune at common law." *Id.*

On June 26, 2012, the court granted DHS temporary custody of I.R. for transfer to a

residential facility and also instructed that I.R. stay with plaintiffs until a spot in a residential

facility became available and not be placed in foster care. Attachment T, pp. 19-20. Plaintiffs

do not contest the validity of that order, but argue that the Oregon defendants are not entitled to

quasi-judicial immunity because they failed to obey that order by placing I.R. into foster care

upon her return from Arizona. It is undisputed that when I.R. arrived in Oregon, openings at

residential therapeutic facilities were unavailable and, as a result, I.R. was placed in a foster

home, contrary to the court's verbal directive. Therefore, the Oregon defendants were not acting

---

[9] As discussed above, neither absolute nor qualified immunity is available if Wirtz attempted to sway the court's decision with false testimony. However, the alleged falsity of Wirtz's affidavit concerns only whether I.R. should be seized and placed in protective custody in the first place, not where to place I.R. once she was seized.

in accordance with a court order when they first placed I.R. in foster care, rather than in her adoptive home.

However, at the next hearing on July 12, 2012, the court approved the Oregon defendants' decision not to return I.R. to plaintiffs. The court recognized that placing I.R. in foster care conflicted with Judge Weber's June 26, 2012 order, but noted that it "was based in part on the expectation that there would be residential treatment available" which had still not occurred. Attachment KK, p. 7 ("so I'm not going to order the child home at this time despite [the court's] earlier ruling."). On June 26, 2012, DHS advised Judge Weber that I.R. needed "some sort of inpatient or residential type facility" and that it had started the process the previous afternoon to find such a placement. Attachment T, pp. 11, 18. Judge Weber was under the clear impression that DHS would "need a few days" to find an open bed in a residential facility and preferred that I.R. wait in plaintiffs' home, rather than be "bounced around" in foster care. *Id*, pp. 20-21. She also agreed with DHS that "if the placement did not become available within a reasonable amount of time or [I.R.] did have to transition home for more than maybe a day," DHS could return to court. *Id*, p. 21. As it turned out, I.R. did not qualify for residential care treatment (Attachment KK, p. 6), eliminating the premise of Judge Weber's directive. Therefore, on July 12, 2012, the court interpreted Judge Weber's prior order to permit DHS to place I.R. in foster care if residential treatment was not available. In other words, DHS's decision to place I.R. in foster care was subsequently ratified by the court.

Moreover, as of July 12, 2012, DHS had legal custody over I.R. and the authority to determine when it was appropriate to return her to plaintiffs' home. Making placement and supervision decisions in regard to a ward's care and custody is an extension of the authority possessed by the court transferring custody to the state and a quasi-judicial function. *DeBiaso v.*

*Spitz*, 957 F Supp2d 1213, 1222 (D Or 2013). Given the unavailability of residential care, DHS had the option either of returning I.R. to plaintiffs or sending her to foster care which the court later approved. In fact, the court consistently found that DHS was acting within its discretion and making reasonable efforts to return I.R. to plaintiffs. Attachment P, p. 2; Attachment R, p. 2; Attachment H, p. 1. Plaintiffs even stipulated in October 2012 that they "need[] the assistance of a child caring agency to learn and exhibit parenting skills necessary to allow the child to safely return home." Attachment R, p. 2.

Therefore, the Oregon defendants are entitled to summary judgment based on quasi-judicial immunity for not returning I.R to plaintiffs' home after she returned to Oregon as ordered by the court on June 26, 2012.

### b.    Qualified Immunity

In the alternative, the Oregon defendants seeks summary judgment on the claim for not returning I.R. to plaintiffs' home based on qualified immunity. In support, they argue that plaintiffs cannot prove any substantive due process violation based on DHS's custody decisions regarding I.R.'s placement.

To prove a substantive due process violation, plaintiffs must prove that the government deprived a person of life, liberty, or property in such a way that "shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty." *Nunez*, 147 F3d at 871, quoting *United States v. Salerno*, 481 US 739, 746 (1987). Plaintiffs must meet the heavy burden of proving that the government's action was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Village of Euclid v. Ambler Realty Co*., 272 US 365, 395 (1926). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *County of Sacramento v. Lewis*, 523 US

833, 846 (1998), *abrogated on other grounds by Saucier*, 533 US at 201; *see also Sylvia Landfield Trust v. City of L.A.*, 729 F3d 1189, 1195 (9th Cir 2013) (citation omitted). Falsifying evidence satisfies this burden, as discussed above.  However, unprofessional or mistaken actions by government officials are not sufficiently shocking to state a substantive due process claim. *See Costello v. Mitchell Pub. Sch. Dist. 79*, 266 F3d 916, 921 (8th Cir 2001) (harassment of handicapped student by teacher may have been "singularly unprofessional" but was insufficiently shocking to state a substantive due process claim).

The parents' liberty interest in the custody and care of their children is balanced against the state's interest in acting as *parens patriae* to protect children.  *Mueller v. Auker*, 700 F3d 1180, 1186 (9th Cir 2012) (citation omitted).  Given the information available, including the lack of a residential placement and other concerns about plaintiffs' investment and participation with mental health "wrap-around" services, it was not arbitrary for the Oregon defendants to believe that they were acting in I.R.'s best interest by placing her in foster care and not returning her to plaintiffs' home on and after June 26, 2012.  Furthermore, the court, not the Oregon defendants, controlled the date of I.R.'s return to plaintiffs' custody.  According to court records, the Oregon defendants made reasonable efforts throughout the proceedings to reunite I.R. with plaintiffs.  On July 12, 2012, the court found that I.R. could not go home without danger of physical injury and emotional injury.  Attachment KK.  At the trial on October 23, 2012, plaintiffs stipulated that they "need[] the assistance of a child caring agency to learn and exhibit parenting skills necessary to allow the child to safely return home."  Attachment R, p. 2.  The court ordered plaintiffs to complete services such as counseling, visits with I.R., and so on.  *Id*, pp. 4-5.  At the January 17, 2013 hearing, the court found that plaintiffs still had "not made sufficient progress toward reunification."  Attachment H, p. 2.  The Citizen Review Board similarly found in

December 2012 that plaintiffs had not made "sufficient progress to make it possible for [I.R.] to safely return home." Attachment E, p. 3.

On this record, plaintiffs cannot establish that the Oregon defendants violated their Fourteenth Amendment right for their placement decisions for I.R. on and after June 26, 2012. According, they also are entitled to summary judgment on this claim based on qualified immunity.

### B.    Insufficiency of Evidence

As discussed above, Wirtz and Smith are not entitled to either absolute or qualified immunity for the allegedly false statements in Wirtz's affidavit. However, they also seek summary judgment on the basis that plaintiffs have failed to prove that their prosecutorial conduct through June 26, 2012, violated the Fourteenth Amendment. In support, Wirtz submits a declaration in which she "vehemently den[ies] making any false statements in [her] affidavit." Wirtz Decl. (docket #59), ¶ 3. However, as discussed above, plaintiffs have submitted declarations by the Arizona defendants which indicate that Wirtz either falsified evidence or misled the court to believe that DHS did not request I.R.'s removal from Phelps's home or was not influential in ACPS's decision to do so. At this juncture, a material issue of fact precludes summary judgment in favor of Wirtz and Smith based on conflicting inferences that may be drawn from evidence in the record.

## II.    State Tort Claims

Plaintiffs allege two state tort claims: (1) that the Oregon defendants intruded both physically and mentally into their private affairs by interfering with their familial relationship (First Amended Complaint, ¶¶ 59–61), and (2) that the Oregon defendants intentionally caused

them extreme emotional distress by failing to investigate the basis for custody of I.R. and for

seizing of I.R. without probable cause.  *Id*, ¶¶ 62–66.

      The Oregon defendants seek summary judgment because the actions taken by them prior

to January 2012 are barred by Oregon Tort Claims Act ("OTCA") notice provisions and because

plaintiffs have failed to establish a genuine issue of material fact as to various elements of their

claims.  Plaintiffs do not respond to these arguments, but instead request that if the court

dismisses the federal claims, a decision on the state claims should be reserved for later

adjudication by the state court.  As discussed above, the § 1983 claim should not be dismissed

against Wirtz and Smith for their actions through June 26, 2012.  And even if all of the federal

claims should be dismissed, this court "may decline to exercise," but is not automatically

divested of, supplemental jurisdiction.  28 USC § 1367(c)(3).  After dismissal of federal claims,

"a district court may exercise its discretion to retain pendent claims, on the basis of judicial

economy."  *Schneider v. TRW, Inc.*, 938 F2d 986, 994 (9th Cir 1991) (citations omitted).  Given

the amount of time that has been invested in this case in this court, jurisdiction should be retained

over the state law claims.  Moreover, upon dismissing the federal claims, the federal court can

also dismiss state law claims on the merits in order to avoid "a further, and futile, round of

litigation in state courts."  *Coe v. County of Cook*, 162 F3d 491, 496 (7th Cir 1999).

      **A.**     **OTCA Notice**

      The Oregon defendants seek summary judgment of plaintiffs' tort claims as untimely.

Pursuant to the OTCA, ORS 30.275(2) requires that a "[n]otice of claim shall be given . . . within

180 days after the alleged loss or injury" for all claims that are not wrongful death actions.

Accordingly, plaintiffs' OTCA notice letter did not provide actual notice of any actions

occurring earlier than 180 days before July 12, 2013, which would be January 13, 2013.[10]  *See* First Amended Complaint, ¶ 4; Attachment MM.

However, actions by the Oregon defendants occurring before January 13, 2013, such as placing I.R. in foster care on June 26, 2012, are part of a continuing tort, not a series of discrete harms.  "A continuing tort is based on "the concept that recovery is for the cumulative effect of wrongful behavior, not for discrete elements of that conduct.'"  *Barrington ex rel. Barrington v. Sandberg*, 164 Or App 292, 296, 991 P2d 1071, 1073 (1999), quoting *Davis v. Bostick*, 282 Or 667, 671, 580 P2d 544, 547 (1978).  Plaintiffs allege that they suffered emotional damage based on their continued separation while I.R. stayed in foster care.  The Oregon defendants argue that plaintiffs have alleged two discrete acts of the initial foster care placement and continued retention in DHS custody.  However, these allegations describe not two separate acts, but the beginning and duration of a continuing tort which did not end until the court placed I.R. back with plaintiffs on March 13, 2013.  The Oregon defendants also argue that plaintiffs' evidence points to separately actionable harms caused by each "back and forth . . . visit[] [between I.R. and her parents]."  *See* First Amended Complaint, ¶ 40.  However, unlike the cases which allege similar but separate injuries, these visits resulted in a single harm, namely "constant[] . . . anxiety and distress."  *Id*.  Plaintiffs' tort claims are clearly timely under the continuing tort doctrine.

### B.    <u>Qualified Immunity</u>

The Oregon defendants argue they have qualified immunity for their decisions in placing I.R. in foster care following the court's order on June 26, 2012.  The OTCA generally makes governmental bodies subject to liability for the torts of its employees.  ORS 30.265(1).  But the OTCA also creates certain exceptions to that liability, including a "claim based upon the

---

[10] Plaintiffs allege two notice dates of July 12 and July 16, 2012, but submit a copy of only the July 16, 2012 notice. For purposes of this motion, the court uses the earlier date for calculation of the 180 days.

performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." ORS 30.265(6)(c). In other words, a decision of a governmental employee is entitled to "discretionary immunity if a governmental person or entity made a policy choice among alternatives, with the authority to make that choice." *Westfall v. State ex rel. Or. Dept. of Corrections*, 355 Or 144, 157, 324 P3d 440, 447 (2014) (*en banc*) (citation omitted).

Both tort claims are based on the Oregon defendants initially placing and continuing to keep I.R. in foster care, the same actions for which they enjoy qualified immunity under the § 1983 claim. The judgment by the Oregon defendants to place I.R. in foster care after gaining protective custody through a court order was a discretionary decision chosen from several alternatives, including returning her to plaintiffs. For this reason, the Oregon defendants' placement decisions, including their investigation and assessment of when plaintiffs were ready to have I.R. return to their home, are entitled to qualified immunity under the OTCA.

### C.  Insufficiency of Evidence

Even if the Oregon defendants do not enjoy qualified immunity, they argue that plaintiffs have failed to adduce sufficient facts to avoid summary judgment. Without reaching the question of whether Wirtz and Smith are entitled to qualified immunity for their prosecutorial actions, including the investigation into I.R.'s need for protective custody, plaintiffs have failed to establish a genuine issue of fact as to several elements of their claims.

### 1.  Intentional Infliction of Emotional Distress

"To state a claim for intentional infliction of severe emotional distress, a plaintiff must plead that (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable

conduct." *McGanty v. Staudenraus*, 321 Or 532, 543, 901 P2d 841, 849 (1995).  To satisfy the

first element, plaintiffs must show the Oregon defendants desired to inflict severe emotional

distress or knew that such distress was certain, or substantially certain to result from their alleged

conduct." *Id* at 550–51.  Plaintiffs have produced no evidence that Wirtz initiated the

investigation and sought protective custody with the intention to cause plaintiffs severe

emotional distress which, of course, Wirtz denies.  Wirtz Decl., ¶ 4.  Nor have plaintiffs

produced evidence that Wirtz was certain that removing I.R. from plaintiffs' care would cause

I.R. and/or her parents severe emotional distress.  I.R. had continued to suffer from serious

behavioral issues after plaintiffs adopted her, despite four years of psychological counseling, and

continued to exhibit some of those same behaviors while visiting Phelps.  If it was clear that

I.R.'s psychological condition had improved while under plaintiffs' care, then a reasonable

factfinder could determine that protective custody was certain to cause I.R. severe emotional

distress.  However, plaintiffs have not produced any evidence that separation would further harm

I.R.'s wellbeing.  Based on the absence of a genuine issue of material fact, the Oregon

defendants should be granted summary judgment as to this claim.

## 2.    <u>Intrusion on Seclusion</u>

To establish their claim for intrusion on seclusion, plaintiffs must prove three elements:

(1) an intentional intrusion, physical or otherwise, (2) upon the plaintiff's solitude or seclusion or

private affairs or concerns, (3) which would be highly offensive to a reasonable person." *Mauri*

*v. Smith*, 324 Or 476, 483, 929 P2d 307, 310 (1996).  The plaintiff bears the burden of

establishing each element, including the defendant's state of mind.  *Id* at 485, 929 P2d at 311.

The element of intent requires "that the actor desires to cause the consequences of his act, or that

he believes that the consequences are substantially certain to result from it." *McGanty*, 321 Or at 550-51, 901 P2d at 852.

To successfully establish this claim, plaintiff must demonstrate that the Oregon defendants did not believe that they had "either the necessary personal permission or legal authority to commit the intrusive act." *Mauri*, 324 Or at 484, 901 P2d at 311, citing *O'Donnell v. U.S.*, 891 F2d 1079, 1083 (3rd Cir 1989).  The Oregon defendants did, in fact, have legal authority to intrude:

> (1) If the Department of Human Services or a law enforcement agency receives a report of child abuse, the department or the agency shall immediately:
> (a) Cause an investigation to be made to determine the nature and cause of the abuse of the child
> . . .
> (3) If the law enforcement agency conducting the investigation finds reasonable cause to believe that abuse has occurred, the law enforcement agency shall notify by oral report followed by written report the local office of the department.  The department shall provide protective social services of its own or of other available social agencies if necessary to prevent further abuses to the child or to safeguard the child's welfare.

ORS 419B.020.

Under that statute, Wirtz and Smith had not only legal authority, but a statutory mandate, to intrude into plaintiffs' lives to investigate I.R.'s safety in Phelps's home and, based on their findings, to pursue protective custody.  It is not sufficient to create a genuine issue of material fact by arguing, as do plaintiffs, that Wirtz and Smith acted without a reasonable cause to believe that abuse had occurred.  In fact, according to plaintiffs' own evidence, it was the "professional judgment" of the Oregon caseworker (presumably Wirtz) that IR should be removed from Phelps's home.  Van Winkle Decl., ¶ 3; Schubert Decl., ¶ 3.  For this reason, summary judgment should be granted to the Oregon defendants on the intrusion on seclusion claim.

## RECOMMENDATION

For the reasons set forth above, the Oregon defendants' Amended Motion for Summary Judgment (docket #58) should be DENIED as to the Fourteenth Amendment claim based on Wirtz and Smith's prosecutorial conduct which resulted in issuance of the initial protective order by the Oregon court on June 26, 2012, and should be otherwise GRANTED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due Monday, June 22, 2015. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED  June 5, 2015.


                                                    s/ Janice M. Stewart
                                                    _____
                                                    Janice M. Stewart
                                                    United States Magistrate Judge