# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION

|  |  |
|---|---|
| **KELLY J. RICHARDSON, and JAMES POWELL, personally and as next friend for I.R. a minor, and S.P., a minor,** | |
| Plaintiffs, | Case No. 3:14-cv-01027-ST |
| v. | **FINDINGS AND RECOMMENDATION** |
| **EMILIE SCHUBERT, in her individual capacity, GINGER VAN WINKLE, in her individual capacity, ERIN WIRTZ, in her individual capacity, JENNIE SMITH, in her individual capacity, KRISTIN LEMON, in her individual capacity, CARLOS CRUTCH, in his individual capacity, LINDSEY VERNOOY, in her individual capacity, DANIELLE SANTILI-DAY, in her individual capacity,** | |
| Defendants. | |

**STEWART, Magistrate Judge:**

///

///

///

1 – FINDINGS & RECOMMENDATION

## INTRODUCTION

Plaintiffs, Kelly Richardson ("Richardson") and James Powell ("Powell"),[1] are the adoptive parents of I.R. who was removed from their custody after they temporarily left her in Arizona with her biological mother, Kerrie Phelps ("Mrs. Phelps"). Two of the defendants ("Arizona defendants") are child safety workers ("CSW") for the Arizona Department of Child Safety ("ADCS"), Emilie Christman (formerly Schubert) ("Christman") and her supervisor, Ginger Van Winkle ("Van Winkle"). They seized I.R. while she was visiting Mrs. Phelps and returned her to the Oregon State Department of Human Services ("ODHS") which then placed I.R. in foster care, instead of returning her to plaintiffs. The other six defendants are employees of ODHS ("Oregon defendants").

The First Amended Complaint alleges claims: (1) against all defendants under 42 USC § 1983 for depriving plaintiffs of their right to a familial relationship under the Fourteenth Amendment; (2) against the Oregon defendants for intrusion into seclusion and intentional infliction of emotional distress; and (3) against the Arizona defendants under 42 USC § 1983 for depriving I.R. of her right to be free from unreasonable seizure under the Fourth Amendment and plaintiffs for their right to procedural due process under the Fourteenth Amendment.

This court has granted summary judgment in favor of the Oregon defendants, except as to defendants Erin Wirtz ("Wirtz") and Jennie Smith based on their prosecutorial conduct that resulted in issuance of the protective order on June 26, 2012 (docket #98). Christman and Van Winkle have now filed a Motion for Summary Judgment (docket #95). For the following reasons, that motion should be granted as to their transfer of I.R. to ODHS on June 27, 2012, and otherwise should be denied.

---

[1] The children of Richardson and Powell (adoptive daughter, I.R., and biological daughter, S.P.) are also named plaintiffs in the action. Because I.R. and S.P. are both minors and not responsible for their parents' actions that are relevant to this case, the term "plaintiffs" refers only to Richardson and Powell.

## STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  FRCP 56(a).  The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  On a motion for summary judgment, the court "draws all justifiable inferences in favor of the non-moving party."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F3d 1119, 1125 (9th Cir 2014), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

## UNDISPUTED FACTS

The undisputed facts are set forth in the court's prior Findings and Recommendation (docket #84) regarding the Oregon defendants.  However, the parties have submitted additional facts that bear on what the Arizona defendants knew and when with respect to their removal of I.R. from the home of her biological mother, Mrs. Phelps, where she lived with her husband, Kelli Phelps ("Mr. Phelps"), and their 10-month old daughter.

After leaving I.R. in Arizona, Richardson learned during her daily phone calls with Mrs. Phelps that I.R. was spanked after acting inappropriately.  Richardson Decl. (docket #104), ¶¶ 8– 9.  Although Richardson did not think the spanking was inappropriate, she believed that it was not effective for disciplining I.R. and reported the incident to I.R.'s counselor in Oregon, Allison Williams ("Williams"), as part of the overall therapeutic plan.  *Id*, ¶ 9.

On Thursday, June 21, 2012, Williams telephoned the ADCS hotline, explained to Rebecca Blau ("Blau") how I.R. had arrived in Arizona and requested a "welfare check" to

confirm that there was no sexual abuse occurring at the Phelpses' home because I.R.'s behavior that prompted the spanking was of a sexual nature.  Ex. B, pp. AZ-RIC 0003, 0018–19, 0022.[2] Willams also told Blau that plaintiffs "have not made plans to bring I.R. home" and "have no idea when or if they will bring her home."  *Id*, p. AZ-RIC 0019.

Blau prepared a detailed Intake Communication from the information provided by Williams and labeled Williams's allegations of "sexual abuse" with priority level "4."  *Id*, p. AZ-RIC 0003, 0018–19.  Sarah Rothpletz ("Rothpletz") was a CSW with ADCS who worked as a night and evening specialist.  Ex. C ("Rothpletz Depo."), pp. 12–14.  In response to the hotline call, she conducted the field work to determine if I.R. needed to be immediately removed from the Phelpses' home.  *Id*.  Rothpletz interviewed Williams by telephone that same day at 5:25 p.m. and added to Blau's report that Richardson "always questioned [whether I.R. was the victim of] sex abuse prior to her care, but there were [*sic*] no founded report."  Ex. B, p. AZ-RIC 0022.  Williams also reported that Richardson was at "whit's [*sic*] end" with I.R.'s behaviors and had sent I.R. to visit Mrs. Phelps "to get a break."  *Id*.  However, Williams did not believe Richardson was going to give up on I.R.  *Id*.

Because of the concern about potential sexual abuse, Rothpletz visited the Phelpses' home at 6:40 p.m. with a police officer, pursuant to protocol.  *Id*, p. AZ-RIC 0021; Rothpletz Depo., pp. 19–20.  The home was clean and appropriate.  Ex. B, p. AZ-RIC 0021; Rothpletz Depo., p. 23.  I.R. denied any sexual abuse and did not exhibit any physical injuries.  Ex. B, p. AZ-RIC 0021.  She told Rothpletz that she was not scared at the Phelpses' home, but wanted to return to live with plaintiffs.  *Id*.  While at the house, Rothpletz heard Mr. Phelps get angry

---

[2] The Arizona defendants have attached Exhibits A-J to their motion (docket #95-1) properly authenticating them. However, plaintiffs have not filed any objections to them.

and yell, "The child almost raped me this morning," and then leave for a walk. *Id.* Mrs. Phelps told Rothpletz that her husband was scared and refused to be alone with I.R. *Id.*

Rothpletz also telephoned Richardson that evening at 9:49 p.m. and learned why she had left I.R. with Mrs. Phelps, including her plan to retrieve her if it did not work out. *Id.* Rothpletz explained to Richardson that "she will need to plan on picking [I.R.] up." *Id*, p. AZ-RIC 0022.

As a result of her investigation, Rothpletz and her supervisor, Theresa Meuse, agreed that I.R. would remain at the Phelpses' home because she was not in present danger. Rothpletz Depo., pp. 23, 32–33.

When Rothpletz finished her initial assessment, she prepared a detailed report of her observations[3] and sent it to the daytime field unit supervisor, Van Winkle, who reviewed it on Monday, June 25, 2012, and assigned Christman to investigate. Ex. D ("Van Winkle Depo."), pp. 12–13, 16. That same day, the Arizona defendants removed I.R. from the Phelpses' home. Ex. F ("Van Winkle Decl."), ¶ 5; Ex. H ("Christman Decl."), ¶ 11. Their decision to remove I.R. was based on information obtained from Rothpletz's report, conversations with ODHS worker Wirtz, Williams, Mrs. Phelps, Richardson, and the advice of an Arizona Assistant Attorney General. Van Winkle Decl. ¶ 3; Christman Decl., ¶ 8.

The Arizona defendants spoke with Wirtz over the telephone several times on June 25, 2012. Exs. E & G ("Wirtz Depo."), pp. 92–93. By the time Wirtz called the Arizona defendants at 2:07 pm, they had decided to remove I.R. from the Phelpses' home and had made a first, unsuccessful attempt to do so. Van Winkle Decl., ¶¶ 5–6, 13; Christman Decl., ¶¶ 4–6; Ex. E, p. Rich-R-168. They also had already consulted the Arizona Attorney General's Office on the matter which had advised removing I.R. by serving a "Notice of Removal" and complying with

---

[3] Exhibit B contains Rothpletz's report and other information known to the Arizona defendants on June 25, 2012, when they decided to remove I.R.

any ODHS request for custody of I.R.  Van Winkle Decl., ¶ 15(bb); Christman Decl., ¶ 15(bb); Ex. E, p. Rich-R-168.

During one of these conversations, Wirtz stated ODHS was going to seek an order to take temporary custody of I.R.  Van Winkle Decl., ¶ 13; Christman Decl., ¶¶ 6–7.  Wirtz's "professional judgment" was that I.R. should be removed from the Phelpses' home and not returned to her adoptive parents.  Van Winkle Decl., ¶ 8; Christman Decl., ¶ 9.  But even if ODHS did not come to retrieve I.R., the Arizona defendants still intended to remove I.R. and bring the Phelpses together with plaintiffs to discuss options for I.R.'s care before seeking protective custody in Arizona court.  Van Winkle Decl., ¶ 9; Christman Decl., ¶ 10; Van Winkle Depo., pp. 27–28.

At 4:51 p.m., Wirtz interviewed Richardson about her decision to leave I.R. with Mrs. Phelps for the summer.  Ex. E, pp. Rich-R-168 to -170.  By this point, the Arizona defendants had already served the Notice of Removal and removed I.R. under A.R.S. § 8-821, pending a hearing under A.R.S. § 8-823(B)(6).  *Id*, p. Rich-R-170; Ex. J.

Two days later on Wednesday, June 27, 2012, ODHS arrived with the Oregon order and the Arizona defendants transferred custody of I.R. to ODHS.  Van Winkle Decl., ¶ 10; Christman Decl., ¶ 11.

## **FINDINGS**

Plaintiffs allege three counts against the Arizona defendants for violating their constitutional rights under 42 USC § 1983 based on their seizure of I.R.  First, I.R. alleges that the Arizona defendants "without just cause or a court order" violated her Fourth Amendment right to be free from an unreasonable seizure.  First Amended Complaint, ¶¶ 41–43 (Count 1). Second, plaintiffs and I.R. allege that the Arizona defendants violated their Fourteenth

Amendment substantive due process right to a familial relationship. *Id*, ¶¶ 44–46 (Count 2).

Third, plaintiffs and I.R. allege that the Arizona defendants violated their Fourteenth

Amendment procedural due process right when they seized I.R. and "delivered her into the

custody of the State of Oregon without providing a hearing." *Id*, ¶¶ 47–49 (Count 3).  The

procedural due process claim (Count 3) has two parts:  first, the seizure and custody of I.R.

without a hearing prior to the arrival of ODHS with an Oregon court order on June 27, 2012;

and, second, the transfer of I.R. to ODHS on June 27, 2012.

## I.    <u>Absolute Immunity</u>

The Arizona defendants first seek summary judgment on the basis that they are entitled to

absolute immunity for turning I.R. over to the ODHS on June 27, 2012, pursuant to the Oregon

court order without a court hearing in Arizona.  "Even actions taken with court approval or under

a court's direction are not in and of themselves entitled to quasi-judicial, absolute immunity."

*Miller v. Gammie*, 335 F3d 889, 897 (9th Cir 2003), citing *Antoine v. Byers & Anderson, Inc.*,

508 US 429, 435–36 (1993).  "Instead, to enjoy absolute immunity for a particular action, the

official must be performing a duty functionally comparable to one for which officials were

rendered immune at common law." *Id.*

There can be no constitutional violation for complying with an Oregon court order.  In

handing over I.R. to the ODHS CSWs who traveled to Arizona to retrieve her, the Arizona

defendants were satisfying the Oregon court order giving custody over I.R. to ODHS.  Thus, the

Arizona defendants are entitled to absolute immunity for turning over I.R. to ODHS once they

received the Oregon court order on June 27, 2012.  That leaves only claims premised on the

seizure of I.R. from June 25, 2012, until receipt of the Oregon custody order two days later.

Prior to the arrival of the ODHS on June 27, 2012, the Arizona defendants are not entitled to absolute immunity.  Until June 27, 2012, they had no knowledge that Wirtz had succeeded in obtaining a court order for I.R.'s removal.  When they removed I.R. on June 25, 2012, from the Phelpses' home, they only knew, based on their conversations with Wirtz that same day, that she "would seek a court order to take physical custody of IR, instead of allowing IR's return to the adoptive parents."  Van Winkle Decl., ¶ 6; Christman ¶ 6.  Only after a hearing on June 26, 2012, did the Clackamas County Circuit Court issue the order granting temporary custody of I.R. to DHS and approving shelter care.  Motion for Summary Judgment (docket #58), Attachment B. In fact, Wirtz did not inform plaintiffs that ODHS would seek temporary custody until the day of the hearing.  *Id*, Attachment E, p. 3.  Thus, when deciding to remove I.R. and issuing the Notice of Removal, the Arizona defendants were not acting pursuant to an Oregon court order but instead:

> expected and hoped Oregon DHS would take her to Oregon, . . . [b]ut if Oregon did not come, then [they] intended, . . . to bring the parties together to discuss a disposition short of going to court, and then, if necessary, submitting a petition under A.R.S. § 8-823(B)(6) within 72 hours of removal.

Van Winkle Decl., ¶ 9; Christman ¶ 10.

Without the existence of the Oregon court order, the Arizona defendants cannot avail themselves of absolute immunity for their actions prior to June 27, 2012.

## II.    Qualified Immunity

The Arizona defendants also seek summary judgment on all three Counts for seizing I.R. prior to receiving the Oregon court order on June 27, 2012, based on qualified immunity. Qualified immunity generally protects discretionary acts by officials.  *Harlow v. Fitzgerald*, 457 US 800, 818 (1982).  The denial of qualified immunity is appropriate when:

> (1) the facts alleged, taken in the light most favorable to the party
> asserting injury, show that the officer's conduct violated a
> constitutional right, and (2) the right at issue was clearly
> established at the time of the incident such that a reasonable officer
> would have understood [his] conduct to be unlawful in that
> situation.

*Green v. City & Cnty. of S.F.*, 751 F3d 1039, 1051–52 (9th Cir 2014) (internal quotation marks
and citation omitted).

      If plaintiffs either fail to show the official's conduct violated a constitutional right or that
the right was not clearly established, then the official is entitled to qualified immunity. *Lacey v.
Maricopa Cnty.*, 649 F3d 1118, 1131 (9th Cir 2011) *on reh'g en banc*, 693 F3d 896 (9th Cir
2012). The court has "the discretion to decide 'which of the two prongs of the qualified
immunity analysis should be addressed first in light of the circumstances in the particular case at
hand.'" *Id*, quoting *Pearson v. Callahan*, 555 US 223, 236 (2009) (additional citation omitted)
(authorizing courts to determine whether right at issue was clearly established before deciding
whether it was violated).

      The analysis is complicated by the fact that the standard for a Fourth Amendment
constitutional violation is very similar to the standard for qualified immunity. Both are governed
by an objective reasonableness standard. However, "it would be inconsistent to conclude that an
officer who acted unreasonably under the constitutional standard nevertheless was entitled to
immunity because he 'reasonably acted unreasonably.'" *Saucier v. Katz*, 533 US 194, 203
(2001), quoting *Anderson v. Creighton*, 483 US 635, 643 (1987). Nevertheless, the Supreme
Court has confirmed that the standards are distinct, as least in the excessive force context, and
not as superfluous or duplicative as they appear:

> If an officer reasonably, but mistakenly, believed that a suspect was likely
> to fight back, for instance, the officer would be justified in using more
> force than in fact was needed.

> The qualified immunity inquiry, on the other hand, has a further dimension.  The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id* at 205.

In other words, even if the removal of I.R. was an unreasonable seizure that violates the Fourth Amendment, the Arizona defendants may be entitled to qualified immunity by showing that a reasonable CSW might mistakenly perceive that the facts about I.R.'s situation justified her removal.

### A.   <u>Constitutional Violation</u>

Plaintiffs and I.R. argue that the seizure and removal of I.R. from the Phelpses' home, and ultimately from plaintiffs' custody, without an Arizona court order violated her Fourth Amendment right against an unreasonable seizure and the entire family's Fourteenth Amendment procedural and substantive due process rights.

"The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies."  *Mabe v. San Bernardino Cnty., Dept. of Pub. Soc. Servs.*, 237 F3d 1101, 1107 (9th Cir 2001) (citations omitted).  "Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury."  *Wallis v. Spencer*, 202 F3d 1126, 1138 (9th Cir 2000) (citations omitted).

"The Fourth Amendment also protects children from removal from their homes absent such a showing." *Rogers v. Cnty. of San Joaquin*, 487 F3d 1288, 1294 (9th Cir 2007), citing *Doe v. Lebbos*, 348 F3d 820, 827 n9 (9th Cir 2003). "Officials, including social workers, who remove a child from its home without a warrant must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Id*, citing *Mabe*, 237 F3d at 1108. Because "the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children," Ninth Circuit precedent permits this court to analyze all constitutional claims against the Arizona defendants together. *Wallis*, 202 F3d at 1137 n8. The existence of reasonable cause and the related issues are all questions of fact to be determined by the jury. *Id* at 1138.

"[T]he state may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse." *Id.* It is undisputed that the Arizona defendants did not have a court order when they removed I.R. Thus, they violated I.R.'s and plaintiffs' constitutional rights unless, at the time of the removal, they reasonably believed that I.R. was likely at imminent risk of serious harm.

### 1.    Basis for Removal

In their declarations, the Arizona defendants identify a list of facts to justify their removal decision. Van Winkle Decl., ¶ 15; Christman Decl., ¶ 15. Most of those facts were set forth in Rothpletz's report based on her investigation on Thursday, June 21, 2012. Van Winkle Decl., ¶ 15(a)–(i), (k)–(y), (aa); Christman Decl., ¶ 15(a)–(i), (k)–(y), (aa). The remaining information was learned by the Arizona defendants on Monday, June 25, 2012, consisting of: (1) full ADCS reports from 2001 to 2004 alleging Mr. Phelps abused his stepchildren (Van Winkle Decl.,

¶ 15(z); Christman Decl., ¶ 15(z)); and (2) Wirtz's professional concern with I.R.'s present situation. Van Winkle Decl., ¶ 15(j); Christman Decl., ¶ 15(j).

Rothpletz's investigation included information received from Williams, Richardson, the Phelpses, and I.R., as well as a visit to the Phelpses' home. Based on that information, Rothpletz, with the agreement of her supervisor, Theresa Meusa, concluded that I.R. could remain in the Phelpses' home because she was not in any present danger. After receiving Rothpletz's report a few days later, Van Winkle assigned the case to Christman for investigation. By the time of the Arizona defendants' telephone call with Wirtz that same afternoon at 2:07 p.m., they had reached the opposite conclusion that I.R. should be removed from the Phelpses' home.

"[A]n official's prior willingness to leave the children in their home militates against a finding of exigency." *Rogers*, 487 F3d at 1294–95 (citations omitted). Other than by pointing to new information learned from the ADCS reports and Wirtz, the Arizona defendants do not explain why they rejected Rothpletz's conclusion of no present danger based on her first-hand observations and discussions with I.R. and the Phelpses. As discussed below, viewing the evidence in the light most favorable to I.R. and the plaintiffs, a reasonable juror could conclude that, despite this additional information, the Arizona defendants lacked reasonable cause to remove I.R.

### 2.    Mr. Phelps's Reports

The "full reports" reviewed by the Arizona defendants summarize three past allegations of abuse and neglect made against Mr. Phelps. Ex. B, p. AZ-RIC 0008. The allegation of physical abuse investigated on September 14, 2004, was found to be unsubstantiated and the case closed. *Id.* The other two accusations of neglect reported in May 2004 were evidently never

investigated or otherwise substantiated.  *Id.*  Van Winkle testified that she and Christman

consulted the ADCS "system" containing more information about these allegations, but could

not specify those details.  Van Winkle Depo., pp. 19–20; Van Winkle Decl., ¶ 15(z).

Van Winkle and Christman recall that the reports "raised very significant concerns" about

I.R. remaining in the Phelpses' home because of alleged "neglect, physical abuse, verbal abuse

and domestic violence," including locking the children in the bedroom "for about a day," who

were then forced "to go to the bathroom outside the window."  Van Winkle Decl., ¶ 15(z);

Christman Decl., ¶ 15(z).  Van Winkle explained that CSWs are "always concerned" whenever

they "see a history on a caregiver, . . . even if the report is unsubstantiated that doesn't mean that

it didn't happen and so we always take that into consideration."  Van Winkle Depo., p. 20.

Christman understood that Mr. Phelps was living with I.R. and had given the spanking[4] that

prompted Williams to be concerned that sexual abuse was happening in the Phelpses' home.

Christman Decl., ¶ 15(z).

Even Rothpletz had some reason to be concerned about Mr. Phelps after he yelled during

her investigation about I.R. almost raping him.  Ex. B, p. AZ-RIC 0021.  But even with

knowledge of Mr. Phelps's role in the spanking incident, Rothpletz still found that I.R. was in no

present danger.  The full reports allegedly contained more information than known and reported

by Rothpletz, but the allegations concern incidents many years before which necessarily reduces

their impact.  Moreover, the Arizona defendants knew that I.R. denied being scared and that

Mr. Phelps was scared of and refused to be alone with I.R.

---

[4] It is unclear who spanked I.R. during the incident that caused Williams to call the ADCS hotline.  I.R. reported to Rothpletz that she was spanked three times during her stay with the Phelpses and that "she got a spanking by [Mr. Phelps] on the butt with a hand and her pants were on."  Ex. B, p. AZ-RIC 0021.  Richardson states that she reported a spanking by Mrs. Phelps to Williams.  Richardson Decl., ¶ 9.  Regardless, Christman relied on I.R.'s statement to Rothpletz that she had been spanked by Mr. Phelps as a factor in removal decision.  Christman Decl., ¶ 15(z).

Although Van Winkle and Christman correctly considered the reports concerning Mr. Phelps, they conducted no further investigation either to justify or alleviate their concern. Van Winkle Decl., ¶ 15(bb); Christman Decl., ¶ 15(bb). "Serious allegations of abuse that have been investigated and corroborated usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody' if they might again be beaten or molested during the time it would take to get a warrant." *Rogers*, 487 F3d at 1294–95, quoting *Ram v. Rubin*, 118 F3d 1306, 1311 (9th Cir 1997). But a CSW cannot seize a child in danger of being abused or neglected "unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime had been — or will be — committed." *Wallis*, 202 F3d at 1138 (citations omitted). "Whether a reasonable avenue of investigation exists, however, depends in part upon the time element and nature of the allegation." *Id.*

Van Winkle recalled that the full report of Mr. Phelps's alleged abuse history was coded as "unsubstantiated." Van Winkle Depo., pp. 19–20. It would have been prudent, not to mention relatively easy, for the Arizona defendants to confirm the outcome of the allegations made against Mr. Phelps in 2001 and 2004. Without confirmation, the allegations against Mr. Phelps can hardly be considered "specific, articulable evidence" supporting reasonable cause to remove I.R. While ordinarily the presence of an adult with a history of abuse might provide reasonable cause to believe a child living under the same roof was in imminent danger of abuse, other facts suggested there was no emergency. The allegations made against Mr. Phelps were ten years old, and Rothpletz's investigation of I.R.'s living situation had found no signs of abuse.

Of course, in assessing the objective reasonableness, account must be taken of any practical exigencies that prevented fuller investigation of the facts before the arrest was made. *Sevigny v. Dicksey*, 846 F2d 953, 957 (4th Cir 1988). The Arizona defendants argue that they had

to make a quick judgment call to protect an evidently abandoned child with Reactive Attachment Disorder ("RAD").  However, they have not submitted evidence that I.R. would have been in more danger had they prolonged the investigation.  Four days earlier, Rothpletz had visited the Phelpses' home and interviewed I.R. before concluding she was in no immediate danger.  Also, the Arizona defendants knew that Wirtz was in the process of obtaining a removal order and would arrive in Arizona to pick I.R. up within 72 hours.  Van Winkle Depo., p. 27.  And even if the court order was delayed, the Arizona defendants also knew that Richardson was preparing to pick up the child as soon as necessary.  If Mr. Phelps was the only threat to I.R., as the Arizona defendants contend, then that danger would be eliminated in a matter of days by either Oregon caseworkers or I.R.'s mother.

Thus, a reasonable juror could conclude that the Arizona defendants acted unreasonably by not investigating Mr. Phelps further before concluding that he presented an imminent danger of serious physical harm to I.R.

### 3.    <u>Communication with Wirtz</u>

The role of Wirtz in the Arizona defendants' decision also is questionable.  Van Winkle and Christman had "several conversations with Wirtz on that Monday" exchanging information and Wirtz expressed that her "professional judgment was that I.R. should be removed from the birth-mother's home and not allowed to return to the adoptive parents."  Van Winkle Decl., ¶ 6; Christman Decl., ¶ 6.  They "do not recall Wirtz urging [them] or encouraging [them] to remove [I.R.]," but also conceded that Wirtz's "professional judgment . . . contributed to [their] decision to remove I.R. from the birth-mother's home and hold her safely until ODHS could come for her."  Van Winkle Decl., ¶¶ 7–8; Christman Decl., ¶¶ 7–8.  Yet at the same time during their first conversation with Wirtz, they "let [Wirtz] know that [they] had decided to remove [I.R.] from

the biological mother's home" and contend their decision was "based entirely upon [their] own

independent judgment under A.R.S. § 8-821 and "independent[] of any wish or plan or request of

ODHS."[5]  Van Winkle Decl., ¶¶ 6, 12; Christman Decl., ¶¶ 6, 13.  They do not explain how

Wirtz could have "contributed to" their removal decision if they had already made that decision.

In addition, neither of them made any notes of their telephone calls with Wirtz until 5:30 pm,

while Wirtz records at least one telephone call with Van Winkle at 2:07 p.m. "which is consistent

with [Van Winkle's] memory."  Van Winkle Decl., ¶ 13 & Ex. A.

Most importantly, Wirtz's perspective provides no additional evidence that I.R. was in

imminent danger of serious physical harm.  At the time of the one documented telephone call by

Wirtz to Van Winkle at 2:07 pm on June 25, 2012, Wirtz had done no investigation of her own

as to the circumstances that led to Richardson taking I.R. to Arizona, what arrangements had

been made for her return, and the changed circumstances since 2007.  She had not spoken yet

with either Williams or Richardson and had no facts to believe that I.R. was in imminent danger

of serious physical injury, abuse or neglect. [6]

Plaintiffs have some basis to question the credibility of the Arizona defendants.  Wirtz

may not have simply contributed to the removal decision by the Arizona defendants, but may

have unduly influenced their decision by asking them to seize I.R. due to her past involvement in

the removal of I.R. from the birth mother.  Based on Wirtz's failure to investigate the situation,

the argument can be made that her "professional judgment" expressed to Van Winkle and

Christman to remove I.R. from her birth mother's home was based only on the fact that she had

removed I.R. in 2007 from her birth mother's home due to neglect.  In other words, Wirtz may

have been angry that plaintiffs, who now had the sole legal authority over I.R. as her adoptive

---

[5] This statement is not contained in the prior declarations submitted by Van Winkle and Schubert.  Miller Decl.
(docket #69), Attachments BB ("Van Winkle Decl.), ¶ 3 & JJ ("Schubert Decl."), ¶ 3.
[6] Wirtz did speak with Richardson later that day at 4:51 p.m.  Ex. E, p. Rich-R-168 to -169.

parents, were undoing her good work in 2007 to protect I.R.  For her to urge I.R.'s removal from the Phelpses' home for that reason and for Van Winkle and Christman to defer to her peremptory advice instead of relying on Rothpletz's recent on-site investigation, could be deemed unreasonable.  In other words, plaintiffs have presented a factual dispute as to what actually caused Van Winkle and Christman to reverse Rothpletz's decision.

### 5.    **Additional Reasons**

The only other fact submitted by the Arizona defendants to demonstrate reasonable cause for their removal decision was that I.R. presented a potential danger to the 10-month old child in the Phelpses' home.  As reported by Rothpletz, Richardson "had found [I.R.] with her hands around the neck of her two-year-old and as afraid [I.R.] would harm the baby," which was "one of the reasons she wanted [I.R.] out of her house."  Van Winkle Decl., ¶ 15(i); Christman Decl., ¶ 15(i); Ex. B, p. AZ-RIC 0021.  However, the statute relied on by the Arizona defendants, A.R.S. § 8-821(B)(1), speaks of removing the child who is a potential victim, not of removing the child for victimizing others.  Moreover, Richardson reported only a concern "about leaving [I.R.] at all unsupervised with the 2-year old."  Ex. B, p. AZ-RIC 0021.  Thus, this does not provide sufficient evidence to support reasonable cause for Van Winkle's and Christman's removal decision.

The Arizona defendants also rely on the Arizona Attorney General's Office recommendation to remove I.R.  Legal advice will not automatically insulate an official from liability, but "it goes far to establish qualified immunity."  *Ewing v. City of Stockton*, 588 F3d 1218, 1231 (9th Cir 2009) (internal quotation marks and citation omitted).  However, the Arizona Attorney General's Office relied on the same information known to the Arizona defendants and, thus, on the same fallacy as explained above.

### B.    <u>Clearly established right</u>

To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S Ct 2088, 2093 (2012) (internal quotation marks, citations, and alterations omitted); *see also Saucier*, 533 US at 202 ("[I]t would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). The Ninth Circuit dissects this analysis into two additional subparts: qualified immunity shields liability if "(1) the law governing the official's conduct was clearly established; and (2) under that law, the official objectively could have believed that her conduct was lawful." *Mabe*, 237 F3d at 1106.

The Arizona defendants do not contest that the constitutional law was clearly established in June 2012 that a child could not be removed from the home without prior judicial authorization absent evidence of "'imminent danger of serious bodily injury and [unless] the scope of the intrusion is reasonably necessary to avert that specific injury.'" *Id*, quoting *Wallis*, 202 F3d at 1138. However, they argue that I.R.'s and plaintiffs' right at issue arises from an Arizona statute, A.R.S. § 8-821 (B)(1),[7] allowing the ADCS to take temporary custody of a child who is "victim or will imminently become a victim of abuse or neglect" and that a reasonable CSW in Arizona would have followed the statute, as opposed to the constitutional standard.

---

[7] The Arizona defendants also believed they had authority to remove I.R. under A.R.S. § 8-821(B)(2):

> Also, with this RAD child having been left by the only mother she would really remember and not receiving any treatment, I believed it was "clearly necessary to protect the child because probable cause exist[ed] to believe that the child [was] . . . suffering serious . . . emotional injury that [could] only be diagnosed by a . . . psychologist."

Van Winkle Decl., ¶ 15(dd); Christman Decl., ¶ 15(dd). If they truly believed that, then they had a statutory duty to have I.R. immediately examined by a psychologist and, in not more than 12 hours, release I.R. to her parents unless the examination revealed abuse or neglect. A.R.S. § 8-821(D). Neither Van Winkle nor Christman made any effort to have I.R. examined by a psychologist or otherwise comply with this statute. Claiming that they relied on this reason to remove I.R. from the Phelpses' home is clearly suspect.

18 – FINDINGS & RECOMMENDATION

It is of no consequence that the statute appears to establish a more lax standard because the Arizona defendants admit that it mirrors the constitutional standard. Even so, it is undisputed that the only possible danger of serious physical injury would have been a result of abuse or neglect to I.R., making the analysis the same regardless of whether the right is constitutional or statutory. The "existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional." *See Grossman v. City of Portland*, 33 F3d 1200, 1209 (9th Cir 1994). However,

> an officer who unlawfully enforces an ordinance in a particularly egregious manner, or in a manner which a reasonable officer would recognize exceeds the bounds of the ordinance, will not be entitled to immunity even if there is no clear case law declaring the ordinance or the officer's particular conduct unconstitutional. In the end, however, an officer who reasonably relies on the legislature's determination that a statute is constitutional should be shielded from personal liability.

*Id* at 1210 (citation omitted).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 US 335, 341 (1986). The standard leaves "ample room for mistaken judgments" *(id* at 335) and "arguable probable cause."

> Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met. . . . Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; "arguable probable cause" will suffice to confer qualified immunity.

*Escalera v. Lunn*, 361 F3d 737, 743 (2nd Cir 2004) (additional internal quotation marks and citations omitted).

To succeed, the Arizona defendants must demonstrate that, based on the information known to them, a reasonable CSW could reasonably believe or mistakenly conclude that I.R. was in imminent danger of serious physical injury, abuse or neglect. Based on her first-hand

observations and investigation, Rothpletz did not so conclude.  Even if Rothpletz reached a reasonable decision, Van Winkle and Christman contend that their contrary decision also was reasonable, entitling them to qualified immunity.  The facts summarized by Rothpletz and then reviewed by the Arizona defendants need not be viewed by *every* reasonable CSW as sufficient evidence of probable cause to bestow qualified immunity on the Arizona defendants.  *See Malley*, 475 US at 350.

Here, of course, the court cannot determine whether I.R. actually was in danger of suffering serious bodily injury, abuse, or neglect at the Phelpses since her removal prevented any harm from occurring.  The Arizona defendants argue that Mr. Phelps's presence in the home made him a danger to I.R. based on his history of abuse and neglect even if he had not yet harmed her.  Yet, as discussed above, they made no attempt to inspect the Phelpses' home or speak with I.R. before deciding to remove her only a few days later based on their paper review.

But even if the Arizona defendants mistakenly concluded that I.R. was in danger, they failed to show how Mr. Phelps posed an imminent threat.  The Arizona defendants suggest that they were wary of I.R. returning to plaintiffs who had sent I.R. to stay alone in the home where she was once neglected and abused.  In making their decision to remove, they relied on the fact that Richardson left I.R. with the Phelpses for an indeterminate time to demonstrate that they had reasonable cause to believe that there was an imminent threat to I.R.'s welfare.  Information about Richardson caused them to become "very concerned about the adoptive parents' judgment and ability and will to care for this child."  Van Winkle Decl., ¶ 15(cc); Christman Decl., ¶ 15(cc).  In their view, Richardson had abandoned this "RAD child — which to [them] was exactly the wrong thing to do with a RAD child — because she was at 'wits end'" and "needed a break."  *Id.*  Rothpletz's report also stated that Williams told the hotline that "the adoptive

parents had not made plans to bring IR home, and they have no idea when or if they will bring her home." Ex. B, p. AZ-RIC 0019.

However, the court must consider how a reasonable CSW would react, given the information available to the Arizona defendants. Despite Williams's third-party report, it is disputed a reasonable CSW would consider Richardson's actions as an attempt to abandon I.R. Williams also told Rothpletz that "she does not believe that [Richardson] is giving up on the child or not willing to have her back." *Id*, p. AZ-RIC 0022. Mrs. Phelps reported during the home inspection that she spoke with Richardson "all the time." *Id*, p. AZ-RIC 0021. Plaintiffs have submitted evidence that on the evening of June 21, Richardson told Rothpletz that she:

> would take the first flight out of Oregon to retrieve [I.R.] if she thought [I.R.] might be in danger. Ms. Rothpletz verified that she did not see any reason for [Richardson] to do so and that [I.R.] was not in danger. [Rothpletz] then gave [Richardson] the name and number to another caseworker, [Rothpletz] advised [Richardson] to call the following day. [Rothpletz] stated that this other caseworker could possibly help Ms. Phelps and [Richardson] to find an appropriate counselor for [I.R.] during her stay in Arizona. [Richardson] attempted to contact this said caseworker and Ms. Rothpletz numerous times the next day, [Richardson] left messages and received no response.

Richardson Decl., ¶ 11.

In other words, if I.R. was in any danger, Richardson was willing to immediately remove her from the Phelpses' home without the need for any intervention by ADCS. In her summary of this conversation with Richardson, Rothpletz does not mention Richardson's offer and states only that she "explained that [Richardson] will need to plan on picking [I.R.] up" and confirms that she instructed Richardson "to call Mary Templin and was provided the phone number." Ex. B, p. AZ-RIC 0022. She also confirms that the next day, Friday, June 22, at 4:07 pm Richardson had left a message "stating that she has left 2 messages for CPSUS Mary Templin and has not received a call back and wants to know what she should do." *Id.* Even Rothpletz's

version of her conversation with Richardson reports that "the plan was never to leave her there but that the plan[e] ticket was open ended because [Richardson] thought if things work out then I.R. could stay the whole summer" and that Richardson "is not willing to give up on [I.R.]" *Id*, p. AZ-RIC 0021.  Under either party's report, the Arizona defendants also knew that Richardson continued to be involved in I.R.'s care by seeking counseling for I.R. in Arizona upon Rothpletz's recommendation. *Id*, p. AZ-RIC 0022.

Assuming the facts in favor of I.R. and plaintiffs, Rothpletz knew that Richardson would immediately retrieve I.R., if necessary.  Either Van Winkle and Christman are charged with this same knowledge, which eliminates the need for an immediate removal of I.R., or they were incompetent by not doing any further investigation.  Accordingly, their conclusion that Richardson had intentionally abandoned I.R. is entirely unreasonable.  Absent that conclusion, they had no objective basis on which to mistakenly conclude that I.R. faced an imminent threat if not removed immediately.  Thus, a material issue of fact precludes the Arizona defendants from obtaining qualified immunity for their actions prior to receipt of the Oregon court order on June 27, 2012.

## RECOMMENDATION

For the reasons set forth above, the Arizona defendants' Motion for Summary Judgment (docket #95) should be GRANTED as to the claims against the Arizona defendants after receipt of the Oregon court order on June 27, 2012, and otherwise should be DENIED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due Monday, November 16, 2015.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED October 30, 2015.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge